UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
GINA R. GAGLIARDI,

Plaintiff, Index #: 26-CV-02961

-against-

PORT JEFF CHRYSLER JEEP INC.,

Defendant.
---------------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT, PORT JEFF CHRYSLER JEEP INC.'S, MOTION TO SET ASIDE THE DEFAULT, AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR A DEFAULT JUDGMENT**

Respectfully,

By: Ryan Bannon, Esq.
Curcio & Bannon, PLLC
*Attorneys for Defendant*
PORT JEFF CHRYSLER JEEP INC.
384 Crystal Run Road, Suite 202
Middletown, New York 10941
845.692.7000

# TABLE OF AUTHORITIES

CASES:

Amalfitano v. NBTY Inc., 128 A.D.3d 743, 9 N.Y.S.3d 352 (2nd Dept., 2015)......................13

American Alliance Insurance Co. v. Eagle Insurance Co., 92 F.3d 57 (2d Cir.1996)................6

Andre Strishak & Assocs., P.C. v. Hewlett Packard Co., 300 A.D.2d 608, 752 N.Y.S.2d 400 (2nd Dept., 2002).........................................................14

Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC, 779 F.3d 182 (2d Cir. 2015)....................................................................6

D'Angelo v. Bob Hastings Oldsmobile, Inc., 89 A.D.2d 785, 453 N.Y.S.2d 503 (4th Dept., 1982), aff'd, 59 N.Y.2d 773, 451 N.E.2d 471 (1983).................................... 14

Enron Oil Corp. v. Diakuhara, 10 F.3d 90 (2d Cir. 1993)..........................................5, 6

Habberstad Volkswagen, Inc. v. GC Volkswagen, Inc., 127 A.D.3d 1019, 7 N.Y.S.3d 463 (2nd Dept., 2015)...........................................................15

N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 102 A.D.3d 5, 953 N.Y.S.2d 96 (2nd Dept., 2012)..........................................................12

New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 662 N.E.2d 763 (1995).........................12

SEC v. McNulty, 137 F.3d 732 (2d Cir. 1998)...............................................6

Stutman v. Chem. Bank, 95 N.Y.2d 24, 29, 731 N.E.2d 608 (2000).................................11

STATUTES:

15 U.S.C. §1638(a)(2)(A)..................................................................10

15 U.S.C. §1638(a)(3).....................................................................11

New York General Business Law §349..............................................10, 11, 12, 13

New York General Business Law §350..............................................10, 13, 14

FEDERAL RULES:

FRCP 12(b)(6)..............................................................................10

FRCP 55(c)..............................................................................5, 6

## TABLE OF CONTENTS

PROCEDURAL HISTORY…………………………………………………………………..…1

STATEMENT OF FACTS……………………………………………………………..……..2

ARGUMENTS…………………………………………………………………………..….5

POINT I: THE DEFAULT WAS NOT WILLFUL…………………………..……......6

POINT II: THE PLAINTIFF IS NOT PREJUDICED……………………………….….8

POINT III: DEFENDANT HAS A MERITORIOUS DEFENSE…………………….…8

POINT IV: DEFENDANT DID NOT VIOLATE TILA……………………………..10

POINT V: DEFENDANT DID NOT VIOLATE NEW YORK GENERAL BUSINESS LAW §349………………………………………………….11

POINT VI: DEFENDANT DID NOT VIOLATE NEW YORK GENERAL BUSINESS LAW §350………………………………………………….13

POINT VII: PLAINTIFF DOES NOT HAVE A VALID COMMON-LAW FRAUD CLAIM………………………………………………….14

POINT VIII: RESCISSION IS NOT JUSTIFIABLE…………………………………..15

CONCLUSION……………………………………………………………………………16

## PROCEDURAL HISTORY

1. On or about May 18, 2026, plaintiff filed the Complaint in this matter. (See Plaintiff's Complaint annexed hereto as ***Exhibit "A"***).

2. On or about May 26, 2026, plaintiff served the Secretary of State with the Complaint. (See Affidavit of Service annexed hereto as ***Exhibit "B"***).

3. On or about June 3, 2026, the State of New York, Department of State mailed defendant, PORT JEFF CHRYSLER JEEP INC. (hereinafter PORT JEFF), a copy of the Complaint. (See Letter from Department of State annexed hereto as ***Exhibit "C"***).

4. In early June, PORT JEFF received the Complaint, and on June 9, 2026, they quickly notified their insurance company, Utica National Insurance Company. (See Affidavit from Alex Vetere annexed hereto as ***Exhibit "D"***). It was PORT JEFF's understanding that the Complaint would be answered in a timely manner. Id.

5. Plaintiff had filed a different Complaint with the Attorney General's Office, which PORT JEFF received notice of in or around March of 2026. Id.

6. Soon after Utica was notified of the lawsuit, Mr. Alex Vetere, fixed operations director for PORT JEFF, informed the adjuster for Utica that the Complaint had been resolved in their favor. Mr. Vetere was talking about Complaint with the Attorney General's Office, but he did not realize the adjuster believed he was talking about the subject lawsuit. As a result, counsel was not retained by Utica until after PORT JEFF was in default. Id.

7. On June 22, 2026, plaintiff filed a Request for Entry of Default and refiled it on June 25, 2026. (See ECF Nos. 8 and 9).

8. On July 1, 2026, a Certificate of Default was filed. (See Certificate of Default annexed hereto as ***Exhibit "E"***).

9. On July 13, 2026, Curcio & Bannon, PLLC, counsel for PORT JEFF, contacted plaintiff's counsel, informing plaintiff's counsel of their intention to defend this matter on the merits and requesting that they agree to set aside the default. Plaintiff's counsel declined said request. (See Declaration of Ryan Bannon, Esq. annexed hereto as ***Exhibit "F"***).

10. On July 14, 2026, Curcio & Bannon, PLLC filed a Notice of Appearance for defendant, PORT JEFF. (See Notice of Appearance annexed hereto as ***Exhibit "G"***).

11. On July 16, 2026, Curcio & Bannon filed a letter to the Court, requesting a pre-motion conference for defendant's motion to set aside the default. (See Letter to the Court annexed hereto as ***Exhibit "H"***).

12. On the same day, July 16th, plaintiff's counsel filed a Motion for Default and then filed a corrected Motion for Default on July 17th. (See ECF Nos. 14 and 15).

13. Annexed hereto as ***Exhibit "I"*** please find defendant's Answer that defendant intends to file when the default is set aside, along with the Rule 7.1 Corporate Disclosure Statement.

## STATEMENT OF FACTS

14. On February 28, 2026, plaintiff purchased a 2025 Jeep Grand Cherokee (hereinafter "the Jeep") from defendant, PORT JEFF, a car dealership. (See Affidavit from Loren Felsman annexed hereto as ***Exhibit "J"***).

15. The Jeep was shown to plaintiff by PORT JEFF's staff, and she was allowed to drive it home and back. Id.

16. The Jeep's selling price, the payoff and negative equity associated with her trade-in, the rebates, down payment, amount financed, interest rate, term, monthly payment, and optional service contract were all disclosed to the plaintiff before she signed the documents, agreeing to purchase the Jeep. Id.

17. The plaintiff indicated she understood these terms before signing. Id.

18. The Bill of Sale and Retail Installment Contract were signed by the plaintiff and explain the pricing, fees, and financing. (See Bill of Sale annexed hereto as ***Exhibit "K"*** and Retail Installment Contract annexed hereto as ***Exhibit "L"***).

19. The plaintiff paid $47,499 for the Jeep. (See ***Exhibit "J"***).

20. The plaintiff was made aware of this price before purchasing the Jeep. Id.

21. This is below the Jeep's MSRP of $48,375. Id.

22. The plaintiff had a 2025 Subaru Crosstrek Premium that she wished to trade in. Id.

23. The trade-in value of plaintiff's Subaru was $23,000. (See Dealership Appraisal and Trade Valuation annexed hereto as ***Exhibit "M"***).

24. PORT JEFF paid $23,000 for her Subaru as a trade-in. (See ***Exhibit "J"***).

25. The plaintiff had an outstanding loan on the Subaru of $36,144.07. Id.

26. The difference between the loan and the value of the plaintiff's Subaru is $13,144.07. Id.

27. The plaintiff asked PORT JEFF to pay off the loan. Id.

28. As part of the deal, PORT JEFF agreed to pay off plaintiff's entire previous auto loan and then add the outstanding balance of that loan, after subtracting the value of the Subaru, to plaintiff's loan amount for the Jeep. Id.

29. The "Price of the Vehicle" shown on the Bill of Sale is $60,643.07. (See ***Exhibits "J"*** and ***"L"***). This is the selling price ($47,499) plus the negative equity from her previous loan ($13,144.07). Id.

30. Mr. Loren Felsman, finance manager for PORT JEFF, explained this to plaintiff, and she indicated she understood this before she signed the Bill of Sale and Retail Installment Contract. (See ***Exhibit "J"***).

31. On the Bill of Sale, the "Portfolio VSC" of $3,400 is the optional extended service contract that plaintiff purchased. The "Sales Tax" of $2,456.48 was included in the Bill of Sale. "License and Title" expense was listed as $309.43. The "DOC Fee" of $175.00 is the dealership administration fee. All of these fees were explained to the plaintiff before she purchased the Jeep. (See ***Exhibits "J"*** and ***"L"***).

32. On the Bill of Sale, the "Financing" of $16,928.98 is the total interest on her loan. This was explained to the plaintiff before she purchased the Jeep. Id.

33. The "Total Time Price" of $83,912.96 was the Total Cash Price plus the Financing. This was explained to the plaintiff before she purchased the Jeep. Id.

34. On the Bill of Sale, the "Cash on Delivery" of $5,000.00 is plaintiff's downpayment. Id.

35. The "Trade-In" value of $36,144.07 is the total value of plaintiff's previous loan for her Subaru. Id.

36. Plaintiff received $5,250.00 in "Rebates," which reduced the total price of the Jeep. Id.

37. When reducing the price by the rebates ($5,250.00) and plaintiff's downpayment ($5,000.00), the total amount that the plaintiff financed was $56,733.98, which was listed on the Bill of Sale as "Payments." Id.

38. The "Total" at the bottom of the Bill of Sale represents what plaintiff is expected to pay when the loan is paid off with interest, reduced by the rebates and downpayment. Id.

39. Plaintiff signed the Bill of Sale in the two locations after all of the above was explained to her. Id.

40. The milage on the Jeep, 2,442 miles, is listed on the Bill of Sale. Id.

41. The Jeep was considered a new vehicle, because plaintiff was the first registered owner of the vehicle, and the Bill of Sale reflects that. Id.

42. On the day the plaintiff purchased the vehicle, Mr. Felsman had a conversation with the plaintiff about the 2,442 miles on the Jeep, and that the Jeep had been a demo vehicle for the dealership. She was well aware of this information and did not withdraw from the sale or ask to cancel the sale on the day she purchased it. (See ***Exhibit "J"***).

43. On the New York State Department of Motor Vehicles Retail Certificate of Sale Receipt, signed by plaintiff, the Jeep is listed as new with the odometer readings of 2,442, confirming plaintiff is the first registered owner. (See New York State Department of Motor Vehicles Retail Certificate of Sale Receipt annexed hereto as ***Exhibit "N"***).

44. The Loan GAP Waiver Addendum, signed by plaintiff, also lists the 2,442 miles on the Jeep. (See Loan GAP Waiver Addendum annexed hereto as ***Exhibit "O"***).

45. The Retail Installment Contract, signed by plaintiff in nine locations, includes the Federal Truth-In-Lending Disclosures, which discloses the interest rate, finance charges, amount financed, and total amount paid throughout the life of the loan. This document also confirms that the Jeep was a demo for the dealership. (See ***Exhibit "L"***).

46. PORT JEFF did not conceal or misrepresent any information from the plaintiff nor did it lie or make false statements to the plaintiff. (See ***Exhibit "J"***).

**ARGUMENTS**

47. Rule 55(c) of the Federal Rules of Civil Procedure states, "The court may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b)." See Rule 55(c) of the Federal Rules of Civil Procedure.

48. "Yet, because defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party." See Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993).

49. "In other words, 'good cause' and the criteria of the Rule 60(b) set aside should be construed generously." Id.

50. "Because Rule 55(c) does not define the term 'good cause,' we have established three criteria that must be assessed in order to decide whether to relieve a party from default or from a default judgment. These widely accepted factors are: (1) whether the default was willful; (2) whether setting aside the default would prejudice the adversary; and (3) whether a meritorious defense is presented." Id.

51. In the case at bar, plaintiff's Rule 55(b) motion for entry of a default judgment should be denied, and the default judgment should be set aside, because the default was not willful, there is no prejudice on the plaintiff to set aside the judgment, and there is a clear meritorious defense.

*POINT I: THE DEFAULT WAS NOT WILLFUL*

52. "Courts have interpreted 'willfulness,' in the context of a default, to refer to conduct that is more than merely negligent or careless." See SEC v. McNulty, 137 F.3d 732 (2d Cir. 1998); Also See American Alliance Insurance Co. v. Eagle Insurance Co., 92 F.3d 57, 62 (2d Cir.1996).

53. Instead, Courts have considered the default "willful" when the defendant's conduct is egregious and not satisfactorily explained. See SEC at 738; Also See Bricklayers & Allied Craftworkers Local 2 v. Moulton Masonry & Constr., LLC, 779 F.3d 182, 189 (2d Cir. 2015).

54. Courts have set aside the default when defendants prove their intent to fulfill their obligations as a litigant. See Enron Oil Corp. at 98.

55. In the case at bar, this is not a case where a defendant ignored the Complaint or chose not to file an Answer.

56. Although plaintiff served the Complaint on the Secretary of State on May 26, 2026, the Complaint was not mailed out until June 3, 2026. (See ***Exhibit "D"***).

57. Defendant did not receive the Complaint until early June 2026. Id.

58. On June 9, 2026, defendant quickly notified their insurance company and sent them the Complaint. It was defendant's understanding that the Complaint was being taken care of, and the proper paperwork would be filed at the proper time. Id.

59. As such, defendant certainly proved its intent to fulfill its obligations as a litigant.

60. It is important to note that in or around March of 2026, plaintiff made a Complaint about PORT JEFF to the Attorney General's Office, separate from the subject lawsuit. Id.

61. Soon after Utica was notified about the subject lawsuit, Alex Vetere, fixed operations director for defendant, informed Utica that the Complaint was resolved in PORT JEFF's favor.

62. Mr. Vetere was referencing the Complaint made with the Attorney General's Office, and he did not realize that the litigation specialist he spoke to at Utica believed he was talking about the subject lawsuit. (See ***Exhibits "D"***).

63. This miscommunication caused a delay in assigning this matter to an attorney, allowing PORT JEFF to be in default.

64. Curio & Bannon, PLLC was assigned this matter after plaintiff filed her Request for Entry of Default. (See Ryan Bannon, Esq.'s Affirmation in Support).

65. Defense counsel called plaintiff's counsel on July 13, 2026, informing plaintiff's counsel that defendant was prepared to file an Answer and requested that the default be set aside so the matter can be decided on the merits. Plaintiff's counsel declined said request. Id.

66. On July 14, 2026, defense counsel filed a notice of appearance. Id.

67. The default was due to a simple miscommunication between the defendant and insurance adjuster. It had only been about 4 weeks between the time to answer and when defense counsel first contacted plaintiff's counsel, explaining their intent to answer the Complaint and defend the

case on the merits.

68. In this matter, there was a delay between when the plaintiff served the Complaint and when PORT JEFF received it. The defendant quickly notified the insurance company. There was a reasonable miscommunication that caused further delay.

69. Given all of these facts, the conduct on the defendant cannot be considered egregious, and the delay has been explained.

70. As a result, the default was not willful.

*POINT II: THE PLAINTIFF IS NOT PREJUDICED*

71. This matter deals with merely a one-month delay in filing an Answer. The Answer would have already been filed had plaintiff agreed to set aside the default in the middle of July and have the case decided by the merits. Ironically, this motion practice commenced by plaintiff is delaying this matter even longer than the default.

72. The only prejudice plaintiff's counsel could come up with is that plaintiff is paying the loan for the vehicle every month. Since this delay was only approximately one month, plaintiff's alleged prejudice is only one month's payment of a loan that she voluntarily agreed to pay.

73. That is nothing compared to the prejudice defendants would face having a judgment against them for a transaction in which they did nothing wrong. As shown below, defendant was open and honest with the plaintiff concerning the milage and the type of vehicle she was purchasing. To now hold defendant, PORT JEFF, accountable for something they did not do just because of a simple miscommunication between PORT JEFF and their insurance adjuster, would be extremely prejudicial and unjust against defendant.

*POINT III: DEFENDANT HAS A MERITORIOUS DEFENSE*

74. All of plaintiff's claims rely on two false allegations.

75. The first is that plaintiff paid more than the MSRP of the vehicle. In fact, plaintiff paid less than the MSRP of the vehicle.

76. The price of the vehicle and all of the charges were explained to plaintiff at the time of purchase.

77. Mr. Loren Felsman, finance manager for PORT JEFF, explained to plaintiff at the time of purchase that she was purchasing this Jeep for $47,499, which is under the MSRP of $48,375. (See ***Exhibit "J"***).

78. The plaintiff asked defendant to trade-in her Subaru. However, her Subaru was only worth $23,000, but her loan was $36,144.07. (See ***Exhibit "M"***). That meant she had a negative equity of $13,144.07. (See ***Exhibit "J"***).

79. At the request of plaintiff, PORT JEFF paid off said loan of $36,144.07, accepted the trade-in, and added the outstanding balance of $13,144.07 to the price of her vehicle on the Bill of Sale, which totals $60,643.07. Id.

80. Plaintiff also purchased an optional extended service contract for $3,400. Id.

81. All of the fees, such as sales tax, license and title fees, and administrative fees, were explained to her and are listed on the Bill of Sale and Retail Installment Contract. Id.

82. The Total Cash Price added up to $66,983.98. Id.

83. However, when discounting her trade-in, plaintiff's deposit of $5,000, and a rebate of $5,250, the total amount that the plaintiff financed was $56,733.98. Id.

84. These numbers are listed in both the Bill of Sale and Retail Installment Contract. (See ***Exhibit "K"*** and ***"L"***).

85. Plaintiff signed the Bill of Sale in two locations and signed the Retail Installation Contract in nine locations. Id.

86. Mr. Felsman explained all of this to plaintiff. (See ***Exhibit "J"***).

87. Plaintiff was well aware of these numbers when she accepted the vehicle and cannot say otherwise when her signature appears on these documents multiple times.

88. The second false allegation is that plaintiff was told the vehicle was new when it was actually a used vehicle. That is also incorrect.

89. This Jeep was a new vehicle, because the Jeep had not previously been titled or registered to a retail owner. Id. Although the vehicle had 2,442 miles on it, plaintiff was the first retail purchaser and first registered owner of the Jeep. Id.

90. The vehicle's mileage was disclosed to plaintiff verbally and in writing. Id.

91. Although the Jeep, as a demo vehicle, had been driven approximately 2,442 miles, it was still considered new. Id. Plaintiff was aware of all of this on the date of purchase. Id.

92. Plaintiff's counsel uses these two false allegations to incorrectly claim common-law fraud and violations in TILA and New York General Business Law §349 and §350.

*POINT IV: DEFENDANT DID NOT VIOLATE TILA*

93. In her Complaint, plaintiff claims that TILA was violated.

94. As an initial matter, plaintiff fails to specify which sections of TILA were violated in her Complaint, which calls for an outright dismissal of that claim for failure to state a cause of action. See Rule 12(b)(6) of the Federal Rules of Civil Procedure.

95. It is only in the plaintiff's motion for default judgment when plaintiff articulates the specific alleged TILA violations.

96. Plaintiff claims a violation of 15 U.S.C. §1638(a)(2)(A), which requires the disclosure of the amount financed. See 15 U.S.C. §1638(a)(2)(A).

97. The Retail Instalment Contract clearly discloses the amount financed under the heading,

"Amount Financed." (See ***Exhibit "L"***).

98. Plaintiff then claims a violation of 15 U.S.C. §1638(a)(3), which requires disclosure of the "finance charge." See 15 U.S.C. §1638(a)(3).

99. Plaintiff incorrectly claims that there was an unexplained increase in price of $14,724.55. (See Plaintiff's Memorandum of Law, p. 11). Plaintiff then baselessly claims that the increase in price was due to plaintiff being a credit customer. (See Plaintiff's Memorandum of Law, p. 11).

100. These outlandish claims are simply false.

101. Plaintiff paid $47,499 for the Jeep. Plaintiff had $13,144.07 remaining on her prior loan that was added on top of that. Plaintiff was well aware of this. (See ***Exhibit "J"***).

102. The Bill of Sale and Retail Instalment Contract explain all of the other charges, such as a service contract and registering fee from the DMV. Id.

103. The Bill of Sale and Retail Instalment Contract also explain the discounts plaintiff received, such as rebates. Id.

104. The total amount that the plaintiff financed is shown to be $56,733.98. Id.

105. The finance charges were certainly disclosed to plaintiff on the date of purchase and are in black and white on the Bill of Sale and Retail Instalment Contract. Id.

106. Mr. Felsman made sure that the plaintiff was aware of all of this. Id.

107. Therefore, TILA has not been violated.

*POINT V: DEFENDANT DID NOT VIOLATE NEW YORK GENERAL BUSINESS LAW §349*

108. To prevail on a claim of a New York General Business Law §349 violation, plaintiff must prove "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." See Stutman v. Chem. Bank, 95 N.Y.2d 24, 29, 731 N.E.2d 608 (2000).

109. To satisfy the first prong, the "defendant's acts or practices must have a broad impact on consumers at large." See N. State Autobahn, Inc. v. Progressive Ins. Grp. Co., 102 A.D.3d 5, 12, 953 N.Y.S.2d 96 (2nd Dept., 2012); Quoting New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 320, 662 N.E.2d 763 (1995).

110. A private contract dispute unique to the parties does not fall under the statute. See New York Univ. at 320.

111. New York General Business Law §349 does not apply when a deal is tailored to meet the purchaser's wishes and requirements. Id.

112. In the case at bar, plaintiff's deal is the result of a negation tailored to meet plaintiff's wishes. She negotiated a price. Plaintiff asked defendant to pay off her entire prior loan and agreed to add the outstanding balance to her current loan. She chose to purchase the Jeep below the MSRP. She chose to purchase an optional service contract. (See ***Exhibit "J"***).

113. This entire deal is tailored to plaintiff's wishes and requirements.

114. Therefore, the first prong is not met.

115. The second prong that must be proven is that the defendant's act was misleading in a material way.

116. In the instant matter, there was no misleading act conducted by the defendant. Plaintiff incorrectly claims that she paid $63,099.55 for the Jeep when the vehicle was advertised for $48,375. (See Plaintiff's Memorandum of Law p. 13).

117. In fact, plaintiff paid $47,499 for the Jeep, less than the advertised price of $48,375. (See ***Exhibit "J"***).

118. As stated above, the extra amount on her loan is all accounted for and was explained to plaintiff at the time of purchase. Id.

119. Plaintiff also claims that it was deceptive to call the vehicle new when it had 2,442 miles on it.

120. However, there was nothing deceptive about what defendant did. Plaintiff was fully aware of the miles on the vehicle when she purchased it. Id. It was also correct to call the vehicle new, because it had never been titled or registered to a retail owner before plaintiff. Id.

121. Since plaintiff was aware of all of this, there is nothing defendant said or did that was deceptive or misleading.

122. Finally, plaintiff must prove an actual injury. See Amalfitano v. NBTY Inc., 128 A.D.3d 743, 745, 9 N.Y.S.3d 352 (2nd Dept., 2015). The plaintiff may not claim "deception" as both the act and the injury. See Amalfitano at 746.

123. In the case at bar, plaintiff failed to articulate actual damages. Instead, plaintiff's counsel makes the incorrect statement that plaintiff paid $63,099.55 for a vehicle advertised at $48,375. (See Plaintiff's Memorandum of Law p. 14).

124. In reality, plaintiff paid $47,499 for a vehicle advertised at $48,375. (See ***Exhibit "J"***).

125. Therefore, plaintiff has absolutely no actual injury from this interaction, and plaintiff cannot claim deception as an injury.

126. Since there was no deceptive or misleading act, this transaction was not consumer-oriented, and plaintiff sustained no injury, New York General Business Law §349 was not violated.

*POINT VI: DEFENDANT DID NOT VIOLATE NEW YORK GENERAL BUSINESS LAW §350*

127. New York General Business Law §350 prohibits false advertising in the conduct of any business, trade or commerce. See New York General Business Law §350.

128. To prevail on a claim of a New York General Business Law §350 violation, "[a] plaintiff

must demonstrate that the advertisement (1) had an impact on consumers at large, (2) was deceptive or misleading in a material way, and (3) resulted in injury." See Andre Strishak & Assocs., P.C. v. Hewlett Packard Co., 300 A.D.2d 608, 609, 752 N.Y.S.2d 400 (2nd Dept., 2002).

129. As explained above, there was nothing deceptive or misleading about anything that was advertised. There is nothing in this deal that impacts consumers at large, and plaintiff failed to prove an actual injury.

130. Therefore, New York General Business Law §350 was not violated.

*POINT VII: PLAINTIFF DOES NOT HAVE A VALID COMMON-LAW FRAUD CLAIM*

131. Plaintiff's common-law fraud claim is solely based on the fact that defendant called this Jeep new even though it had 2,442 miles on it. However, plaintiff fails to acknowledge the fact that all of this information was disclosed to plaintiff at the time of purchase.

132. Nothing about this vehicle was concealed to plaintiff.

133. Plaintiff cites D'Angelo v. Bob Hastings Oldsmobile, Inc., which is distinguishable from the case at bar. See D'Angelo v. Bob Hastings Oldsmobile, Inc., 89 A.D.2d 785, 453 N.Y.S.2d 503 (4th Dept., 1982), aff'd, 59 N.Y.2d 773, 451 N.E.2d 471 (1983).

134. In D'Angelo, defendant hid the fact that the vehicle was a "demonstrator," and plaintiff found this out after he had purchased the vehicle. Id.

135. In the case at bar, plaintiff even admits that she knew the vehicle was a demo when she drove the vehicle home to get her passport and come back to finalize the deal. (See Plaintiff's Default Motion, Plaintiff's Affidavit).

136. She knew the vehicle was driven 2,442 miles before she purchased it. She signed the documents that state the miles on it. It even states "Demo" on the Retail Instalment Contract that she signed. (See ***Exhibit "L"***).

137. Mr. Felsman explained to the plaintiff that the Jeep was a demo. (See ***Exhibit "J"***).

138. There is no fraud, because there was no misrepresentation of fact. All material facts were disclosed to plaintiff at the time of purchase.

139. Mr. Loren swears in his affidavit that the information he explained to the plaintiff regarding the transaction was truthful and accurate, and he did not intentionally conceal or misrepresent any information, nor did he lie or make false statements to the plaintiff. Id.

140. Therefore, there was no intent to induce reliance on any misrepresentation of a fact.

141. There was no justifiable reliance when plaintiff was informed of the mileage at the time of purchase, and she agreed to the deal.

142. Finally, plaintiff still cannot prove damages considering she paid below the MSRP.

143. Therefore, there was no common-law fraud in the subject transaction.

*POINT VIII: RESCISSION IS NOT JUSTIFIABLE*

144. "The equitable remedy of rescission is only to be invoked where the plaintiff has no adequate remedy at law and where the parties can be substantially restored to their status quo ante positions." See Habberstad Volkswagen, Inc. v. GC Volkswagen, Inc., 127 A.D.3d 1019, 1020, 7 N.Y.S.3d 463 (2nd Dept., 2015).

145. In the case at bar, the parties cannot undo a car loan of $56,733.98 with the lender. They cannot undo the taxes and DMV fees. They also cannot bring back plaintiff's prior car loan of $36,144.07. Additionally, now that the vehicle is actually used, the value of the vehicle is lower than it was when purchased, and therefore, if the vehicle was given back to the defendant, it would be a lower value compared to when she purchased it.

146. With all of these issues considered, rescission is not just in this circumstance.

*CONCLUSION*

147. The plaintiff's default motion should be denied in its entirety, and the default should be set aside, allowing this matter to be heard on the merits.

148. There was no willful delay on the part of the defendant. The plaintiff will not be prejudiced by setting aside the default, and PORT JEFF has a meritorious defense for every single claim that the plaintiff makes.

149. The pricing, fees, and financing were all explained to the plaintiff. She agreed to the deal and signed the appropriate paperwork.

150. There was nothing hidden from plaintiff, and she was not misled by PORT JEFF.

151. Therefore, the defendants demonstrated that this Court should set aside the entry of default for good cause.

**WHEREFORE**, it is respectfully requested that this Court issue an Order denying plaintiff, GINA R. GAGLIARDI's, motion for default judgment in its entirety; granting defendant, PORT JEFF CHRYSLER JEEP INC.'s, motion to set aside the default in its entirety, allowing defendant, PORT JEFF CHRYSLER JEEP INC., to serve its Answer and defend this matter on the merits, and for such other, further, and different relief as this Court deems just and proper.

Dated: Middletown, New York
August 7, 2026

Respectfully submitted,

________________________
Ryan Bannon, Esq.